UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LANCE GORDON OCAMPO,<br><br>        Plaintiff,<br><br>    v.<br><br>CORIZON, LLC., a Missouri Corporation; DIANNA COLLINS; BRIAN CROWL, Lieutenant North Idaho Correctional Institution; JIM DUNNING, KEITH BOLIN; PATTI SCHMITT; and JOHN/JANE DOES 1-10;<br><br>        Defendants. | Case No. 1:18-cv-00047-DCN<br><br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court are numerous motions for summary judgment filed by the Defendants in this case. Dkts. 79, 82, 83. Defendants Corizon, Dianna Collins, Keith Bolin, and Patti Schmitt (the "Corizon Defendants") also filed two Motions in Limine (Dkts. 80, 97) and Defendants Crowl and Dunning each filed a Motion to Strike (Dkts. 95, 101). The latter four motions challenge certain evidence and testimony presented by Plaintiff Lance Gordon Ocampo in opposition to Defendants' various motions for summary judgment.

The Court held oral argument on June 26, 2020, and took the motions under advisement. For the reasons set forth below, the Court GRANTS in PART and DENIES in PART the various evidentiary motions and GRANTS each of the Defendants' Motions for Summary Judgment.

MEMORANDUM DECISION AND ORDER - 1

## II. BACKGROUND

### A.  Factual Background[1]

Ocampo is a former inmate of the Idaho Department of Corrections ("IDOC") who was housed at North Idaho Correctional Institution ("NICI") beginning on March 14, 2016. Ocampo resided at NICI because a judge sentenced him to a Retained Jurisdiction program or "rider." Broadly speaking, retained jurisdiction inmates at NICI—such as Ocampo—are under less security than those housed at a traditional prison; inmate housing units are not as restrictive and inmates are allowed to move about more freely in order to attend programming, work, medical appointments etc.

Upon his incarceration, Ocampo went through the standard Idaho State Correctional Institution ("ISCI") intake process before being transferred to NICI. On his Medical History Questionnaire, Ocampo indicated his most recent dental examination was "longer than 10 years [ago]," that he had a significant history of drug and alcohol abuse (in particular smoking), and that he believed he had some cavities and "rotten" wisdom teeth. Dkt. 83-4, at 7.

Shortly after arriving at NICI—on April 24, 2016—Ocampo filed a Health Service Request ("HSR") form to have a wisdom tooth pulled. Ocampo's wisdom tooth, which was severely decayed, was removed four days later—on April 28, 2016—by a Dentist, Dr. Bradley Schaff, DDS. The procedure was uneventful.

---

[1] Although the Court has previously set forth the facts of this case (*see* Dkt. 74, at 2-4), it does so again here—and in greater detail—in order to provide a complete record upon which to review the motions for summary judgment.

On April 29, 2016—the day after the tooth extraction—Ocampo began experiencing some pain in his mouth but believed the pain was "manageable" and did not submit an HSR or notify any medical providers or correctional officers of his discomfort. Dkt. 83-4, at 7.

The following day—April 30, 2016—at 8:16 p.m., Ocampo submitted an HSR complaining of pain in the extraction area and opining that the site might be infected. That same day, Ocampo was seen by Correctional Medical Specialist ("CMS") Hans Gentry. CMS Gentry took Ocampo's vitals (which were within normal range), noted the swelling around the extraction site, and prescribed ibuprofen to help Ocampo cope with the pain. Gentry also scheduled Ocampo for a follow-up dental visit on May 5, 2016—the next time a dentist was scheduled to visit NICI.

The next day, on May 1, 2016, Ocampo submitted another HSR complaining of more pain, difficulty opening his mouth, and a sore throat. At 8:00 a.m. that morning, CMS Jim Dunning saw Ocampo. Dunning noted that Ocampo's vitals were within range but observed that Ocampo had some increased swelling and difficulty opening his mouth. During this consultation, Ocampo reported that an inmate in his housing unit had strep throat. Based upon his assessment of Ocampo—and the fact that a strep infection was, in fact, going through the facility at the time—Dunning prescribed Ocampo Pen V-K,[2] 500mg, to be taken three (3) times per day for 10 days. Dunning also scheduled Ocampo for a follow-up appointment for later that day around noon.

---

[2] Pen V-K is a Penicillin antibiotic that can be used to treat several bacterial infections including strep throat and dental infections. Dkt. 83-12, at 4; Dkt. 83-14, at 4.

MEMORANDUM DECISION AND ORDER - 3

When Dunning saw Ocampo later that day, Ocampo inquired as to what he was supposed to do for the pain and his inability to eat. Dunning told Ocampo to "cowboy up," wait for the antibiotics to take effect, and eat what he could. After both appointments, Dunning initiated referral orders for further evaluation and care.

On May 2, 2016, Ocampo submitted another HSR complaining of continued pain and swelling around the tooth extraction site. Licensed practical nurse ("LPN") Patti Schmitt attended to Ocampo at approximately 12:15 p.m. that day. LPN Schmitt called Dr. Schaff—the dentist who removed the tooth—and apprised him of Ocampo's condition. Dr. Schaff ordered a regimen of antibiotics for Ocampo, including: 1) the continued use of Pen V-K) an injection of Rocephin,[3] and 3) 500mg of Metronidazole.[4] The Rocephin injection was given to Ocampo after the call with Dr. Schaff and Ocampo also began taking Metronidazole that day.

Later in the day on May 2, 2016, Ocampo was involved in a telephone conversation with Lt. Brian Crowl and an unknown officer. This officer—who reported to Crowl—called Crowl on Ocampo's behalf due to Ocampo's self-reported medical needs. While Ocampo cannot recollect the name of this officer, a subsequent review of the Unit 4 documents reveal that Officer Donna Mader was on duty that day and was likely the person who called Crowl on Ocampo's behalf. Dkt. 82, ¶ 15.

---

[3] Rocephin IM is a broad-spectrum antibiotic used to treat infections in the head and neck. Dkt. 83-12, at 4.

[4] Metronidazole, or "Flagyl" is another antibiotic commonly used for odontogenic infections. Dkt. 83-12, at 4; Dkt. 83-14, at 4.

During this phone conversation, Ocampo heard the officer tell Crowl that Ocampo had swelling in his face, that Ocampo reported he thought he was dying, and that Ocampo was having difficulty eating and sleeping because of the pain. The officer allegedly relayed a question from Crowl to Ocampo asking him if he would have gone to the hospital had he not been incarcerated. The officer then told Ocampo that Crowl thought Ocampo was drug seeking, that he would not be going to the hospital at that moment, and that he should wait for medical personnel to respond. Dkt. 82, ¶ 22.

At approximately 7:00 p.m. that evening, Registered Nurse ("RN") Amanda Shriver checked on Ocampo. She observed a low-grade fever (99.3 degrees) and that Ocampo was resting and able to speak. RN Shriver updated Dr. Schaff on Ocampo's condition.

Later that night, at approximately 8:20 p.m., LPN Keith Bolin checked on Ocampo. While his temperature and vitals appeared slightly elevated, Bolin noted that such symptoms were consistent with inflammation and the use of antibiotics. Bolin observed that Ocampo appeared alert and requested that security check on him throughout the night since medical staff are not onsite from roughly 9:00 p.m. to 4:00 a.m.

The next morning, on May 3, 2016, at 5:30 a.m., LPN Schmitt again met with Ocampo. LPN Schmitt noted that Ocampo's temperature was 100 degrees, that he was alert, that the swelling had started to progress into his neck area, and that security told her Ocampo had slept during the night.

That same day, at about 12:30 p.m., RN Shriver met with Ocampo and observed that the swelling was increasing in his neck and shoulder area. Because it appeared the swelling in Ocampo's neck was not improving, RN Shriver called the on-call provider,

Nurse Practitioner ("NP") Dianna Collins, to coordinate transferring Ocampo to a hospital. Because NP Collins was not on-site at NICI, RN Shriver took pictures of Ocampo's neck and face and sent them to NP Collins.[5] After viewing the photographs and consulting further with RN Shriver, NP Collins authorized Ocampo to be transferred to St. Mary's Hospital in Cottonwood, Idaho.

At St. Mary's, Ocampo was ultimately diagnosed with Ludwig's Angina—a rare mouth infection. Ocampo was transferred to a larger hospital—St. Josephs in Lewiston, Idaho—for further assessment and eventually had surgery to remove a large abscess that had developed due to the infection. The surgery was uneventful. Ocampo stayed at the hospital for several days.

On May 10, 2016, Ocampo was transported to the Idaho State Correctional Institution ("ISCI") where he served the remaining six months of his sentence. Ocampo was released from custody on December 13, 2016.

### B. Procedural Background

Ocampo filed his Complaint on January 30, 2018. Dkt. 1. Defendants Anderson and Crowl filed an Answer on March 5, 2018. Dkt. 9. On April 4, 2018, Ocampo agreed to Defendants' Stipulation for an Order to Amend Answer to his Complaint which amended and added a Fifteenth Affirmative Defense. Dkts. 13, 14. The same day, Defendants filed their Amended Answer. Dkt. 15.

---

[5] It appears this took some time because RN Shriver did not have good cellular reception at NICI. Accordingly, she drove down the road (to a location with good cellular service), sent the pictures to NP Collins, and then returned to NICI.

On April 4, 2018, the parties also filed a stipulated Litigation Plan which set the deadline of July 5, 2018, for joinder of parties and amendment of pleadings. Dkt. 17. On April 30, 2018, Ocampo moved to file an Amended Complaint to add claims against certain defendants who were formerly unknown. Dkt. 27. On May 21, 2018, the Court granted the Motion. Dkt. 32. On June 29, 2018, Defendants Anderson and Crowl filed an Answer to Ocampo's Amended Complaint. Dkt. 37. On July 5, 2018, the deadline for amendment of pleadings and joinder of parties expired. Dkt. 25; Dkt. 35.

Defendants Anderson and Crowl then filed an early motion for summary judgment. Dkt. 40. Numerous procedural and scheduling motions followed. Dkts. 51, 52, 55, 56, 57, 58, 60. The Court dealt with these motions in its Memorandum Decision and Order issued April 4, 2019. Dkt. 74.

The parties subsequently reset certain litigation deadlines as follows: all fact discovery was to be completed by May 6, 2019; all expert discovery was to be completed by May 18, 2019; Defendants would disclose their experts by April 11, 2019; and Plaintiff would disclose any rebuttal experts by May 13, 2019. Dkt. 73. The dispositive motion deadline was subsequently reset for July 31, 2019. Dkt. 75.

On July 31, 2019, all represented defendants filed motions for summary judgment: Defendant Dunning (Dkt. 79); Defendant Crowl (Dkt. 82); and the Corizon Defendants (Dkt. 83). The Corizon Defendants also filed their First Motion in Limine (Dkt. 80) seeking to limit information presented in Ocampo's expert reports. Ocampo responded to all pending motions in due course.

Defendants filed reply briefs in support of their motions for summary judgment and also each filed a motion to strike various testimony and evidence Ocampo presented in his responsive briefing. The Corizon Defendants styled their motion as a Second Motion in Limine (Dkt. 97); Defendants Dunning and Crowl styled their motions as Motions to Strike (Dkts. 95, 97).

Once briefing was complete, the Court held oral argument on all pending motions. The Court will address each motion below.

### III. LEGAL STANDARD[6]

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). Importantly, the Court does not make credibility determinations at this stage of the litigation. Such determinations are reserved for the trier of fact. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992).

In considering a motion for summary judgment, the Court must "view[] the facts in the non-moving party's favor." *Zetwick*, 850 F.3d at 441. To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror

---

[6] The various Motions in Limine and Motions to Strike will be discussed below in conjunction with their companion motions for summary judgment. The Court will set forth specific legal standards for those motions individually where necessary.

drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (citation omitted). Accordingly, the Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

## IV. ANALYSIS

### A. Corizon Defendants' Motion for Summary Judgment

Before substantively addressing the Corizon Defendants' Motion for Summary Judgment (Dkt. 83), the Court must address the concurrently filed motions in limine (Dkts. 80, 97) as each involves the evidence the Court will consider when analyzing the Motion for Summary Judgment.

#### 1. *Corizon's First Motion in Limine (Dkt. 80)*

On July 31, 2019—in conjunction with their filing of a Motion for Summary Judgment—the Corizon Defendants filed a Motion in Limine seeking to exclude two of Ocampo's expert reports. The first report was produced by Cheryl Fabello, RN, and purportedly addresses the standard of care in a correctional facility. The second was authored by Dr. Jason S. Ludwig.

Because Corizon presents separate arguments as to why each of these individuals' reports should be excluded, the Court will address each separately.

     a. <u>Cheryl Fabello</u>

Cheryl Fabello is a registered nurse who works in Boise, Idaho. She has spent the majority of her career caring for veterans and senior citizens. In support of the claims at issue in this case, Ocampo commissioned Fabello to review and opine on the standard of care in a correctional facility—specifically NICI. *Broadly* speaking, Fabello's opinion is that Defendants "breached national and community standards of care by delaying and failing . . . to completely and accurately document and communicate . . . changes in Mr. Ocampo's condition so he could receive medical care for his obvious distress, pain and suffering." Dkt. 80-3, at 7. The Corizon Defendants object to Fabello's report under Federal Rule of Civil Procedure 56 and Federal Rule of Evidence 702.

"Rule 56 requires that affidavits supporting or opposing summary judgment 'be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *Pauls v. Green*, 816 F. Supp. 2d 961, 978 (D. Idaho 2011) (quoting Fed. R. Civ. P. 56(c)(4)).

The extent to which experts may render an opinion is addressed under the well-known standard established in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and its progeny, and now set forth in Rule 702 of the Federal Rules of Evidence. *See Moore v. Deer Valley Trucking, Inc.*, No. 4:13-CV-00046-BLW, 2014 WL 4956241, at *1 (D. Idaho Oct. 2, 2014).

Rule 702 establishes several requirements for admitting an expert opinion. First, the evidence offered by the expert must assist the trier of fact either to understand the evidence or to determine a fact in issue. *Primiano v. Cook*, 598 F.3d 558, 563 (9th Cir. 2010); Fed. R. Evid. 702. "The requirement that the opinion testimony assist the trier of fact goes primarily to relevance." *Id.* (internal quotation marks and citation omitted).

Additionally, the witness must be sufficiently qualified to render the opinion. *Id.* If specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue, a witness qualified by knowledge, skill, experience, training or education may offer expert testimony where: (1) the opinion is based upon sufficient facts or data, (2) the opinion is the product of reliable principles and methods; and (3) the witness has applied those principles and methods reliably to the facts of the case. Fed. R. Evid. 702; *Daubert,* 509 U.S. at 592–93; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The inquiry is a flexible one. *Primiano*, 598 F.3d at 564. Ultimately, a trial court must "assure that the expert testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* (internal quotation marks and citation omitted).

Reliability and relevance, however, must be distinguished from problems with expert opinions that amount to impeachment and, consequently, do not warrant exclusion. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (stating that, under *Daubert*, "[t]he judge is 'supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.'" (quoting *Alaska Rent–A–Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)). Thus, "[a]s *Daubert* confirmed, '[v]igorous cross-examination, presentation of contrary evidence, and

careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *United States v. Wells*, 879 F.3d 900, 933 (9th Cir. 2018) (quoting *Daubert*, 509 U.S. at 596).

In this case, the Corizon Defendants object to Fabello's expert report and opinion arguing she is not qualified to testify to these matters because she has never worked in a correctional setting, never worked in north Idaho (at NICI or otherwise), and has never worked with patients who have Ludwig's Angina.

Fabello does not dispute this. She readily admits that she has never worked in a correctional facility, has never worked at NICI (or anywhere in north Idaho), and that her only efforts to familiarize herself with the applicable standard of care was to call the nursing faculty at Lewis and Clark State College (which is located in Northern Idaho) and discuss the local standard of care with a faculty member. She also admits she has no experience with Ludwig's Angina. Dkt. 80-5, at 4-10.

The Corizon Defendant's further argue that Fabello is not qualified to testify regarding the standard of care for nurse practitioners as she, herself, is not a nurse practitioner, but rather a registered nurse.

Ocampo disagrees with both assertions, arguing that while Fabello might not have experience in the correctional setting, such is irrelevant because she is testifying as to whether the medical care was deliberately indifferent, not what the standard of care is in a correctional facility. Second, Ocampo argues the Corizon Defendants are being myopic in their analysis and that a registered nurse can opine on the qualifications and work standards of a nurse practitioner.

MEMORANDUM DECISION AND ORDER - 12

As to the first assertion, Ocampo attempts to make a distinction where there is none. While Fabello is testifying as to "deliberate indifference," the only way to determine whether any particular behavior was indifferent is to determine what the appropriate standard of care was and whether Defendants actions were reasonable. In this case, such analysis *must* take into account the fact that Ocampo's care took place in a correctional setting. While Ocampo admits that "inmates are not entitled to the same medical care that would be provided outside of prison," Dkt. 91, at 6, he contends that does not mean they are entitled to an inferior standard of care. Again, the Court struggles to see the distinction. To be sure, the Court is not advocating for, or condoning, an inferior standard of care, but notes there are obvious considerations that must be taken into account when treating prisoners in a correctional setting which would not be present in the community. Again, while those considerations do not diminish the actual standard of care in the aggregate, they must, nonetheless, be weighed when determining whether prison officials, employees, or agents acted with deliberate indifference in providing medical care in any given situation.

It is clear from Fabello's testimony and report that she does not have personal experience in many of the matters at issue in this case. Experience, however, is not necessarily required to render an expert opinion. Under Rule 702, a witness may qualify as an expert based on their "knowledge, skill, experience, training or education." Fed. R. Evid. 702. In other words, "hands-on" experience is not a prerequisite to rendering testimony. Fabello has both a bachelor's degree and a master's degree in nursing. She explains in her report that she took the time to research, analyze, and review all of Ocampo's medical files

and consulted with local practitioners to develop her opinions regarding the applicable standard of care in North Idaho—an allowed methodology. *See e.g., Perry v. Magic Valley Reg. Med. Ctr.*, 995 P.2d 816, 821 (2000) ("A common means for an out-of-area expert to obtain knowledge of the local standard of care is by inquiring of a local specialist."). In short, Fabello has extensive training in nursing and has familiarized herself, albeit in a generalized manner, with the standard of care in North Idaho. Additionally, the fact that Fabello is a registered nurse giving opinions regarding nurse practitioners is not fatal to her opinion. These factors cut in favor of allowing her testimony.

These observations aside, the Court is still concerned that Fabello has *no* training, experience, or education in *correctional nursing*—and did not consult with anyone who does—nor does she have any experience in diagnosing or treating Ludwig's Angina—the disease at issue in this case. This lack of experience, training, and education does not render Fabello's testimony inadmissible, however, it lends itself to the conclusion that the Court should give it little weight when determining the motions today.

First, Fabello claims she has some co-workers who previously worked in correctional settings and that she has reviewed former inmates' medical records as part of her current employment, but does not necessarily indicate how these situations informed her current opinion. Notwithstanding such circumstances, as Corizon's expert points out, correctional nursing is, simply put, "nothing like community nursing." Dkt. 81-2, at 14. Correctional nurses "are aware of another universe of considerations which can drive the threshold for [deciding to transfer a patient to the emergency department]; considerations that community or extended care nurses never have to reconcile." *Id.* at 12. As noted,

Fabello admits she has never worked in a correctional setting, has never worked with a Correctional Medical Specialist, and is "unaware" of what it means to be a Certified Correctional Health Professional. Dkt. 80-5, at 90:16-91:16. She also stated that she is unfamiliar with the National Commission on Correctional Health Care guidelines applicable to prisons, including those at issue in this case. *Id.* at 89:3-23. Fabello likewise does not have any experience in emergency or trauma nursing.

Now, the Court wishes to again reiterate that working in a correctional facility is not dispositive of the issue. As United States Magistrate Judge Dale has previously found, there is no legitimate reason to "exclude[] an otherwise qualified expert from testifying [in a deliberate indifference case involving a prisoner] on the basis . . . that the [witness] had not practiced medicine in a correctional setting." *Ball v. Kootenai Cty.*, No. 214CV00246EJLCWD, 2016 WL 4974949, at *6 (D. Idaho Sept. 16, 2016).[7] However, Fabello's failure to—at a minimum—familiarize herself with the unique circumstances present in correctional nursing and how those conditions inform decisions made by medical professionals does little to "help the trier of fact [the Court in this instance] to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

---

[7] *But see Ansu v. CoreCivic*, No. CV1803851PHXDWLDMF, 2020 WL 836536, at *2 (D. Ariz. Feb. 20, 2020) ("There are strong reasons to suspect that the standard of care applicable to prison psychiatrists may be different than the standard of care applicable to psychiatrists practicing in other settings."). Caselaw on the standard of care in prisons in relation to the standard of care in the community as to a particular medical profession or in relation to a specific medical condition is—like caselaw on the qualifications of an expert or the sufficiency of an experts' methods—voluminous. There is no shortage of cases allowing an expert to testify in one circumstance, but disallowing an expert from testifying in another, albeit similar, circumstance. Ultimately, the decision to admit expert testimony is a matter of discretion for the trial court and must be weighed against the backdrop of the specific claims at issue. *Clausen v. M/V NEW CARISSA,* 339 F.3d 1049, 1055 (9th Cir.2003).

Second, the Court finds it likewise troubling that Fabello has no experience with the disease at issue in this case—Ludwig's Angina. In fact, Fabello noted in her deposition that she was unfamiliar with the term and had to look it up. Dkt. 80-5, at 8. All parties admit that Ludwig's Angina is a rare disease. The fact that Ludwig's Angina is so rare indicates the diagnosis and treatment is, in all likelihood, *not* readily known to the average medical professional. Fabello's inexperience with this specific disease naturally calls into question her conclusions that the way in which Defendants went about treating it was deliberately indifferent. These two factors cut against allowing Fabello's testimony.

Ultimately, the Court finds that Corizon's concerns—many of which the Court shares—go to the weight of Fabello's testimony, not admissibility. Thus, upon review, the Court will not strike Fabello's testimony outright, but will give it very little weight. Fabello has complied with the requirements of Rule 702, *Daubert*, and general principles regarding expert witnesses. That said, the Court finds that because her testimony regarding the present issues does not "rest[] on a reliable foundation" and fails to appreciate the unique circumstances at play in this case, it does little to help the Court in its evaluation of the Corizon Defendants' Motion for Summary Judgment. *See Primiano*, 598 F.3d at 564. Ultimately, as will be explained in greater detail below, it is apparent that the Corizon Defendants' actions were appropriate under the circumstances. *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019) ("Expert testimony cannot create a genuine issue of material fact if it rests on assumptions that are not supported by evidence.").

The Corizon Defendant's Motion to Strike Fabello's testimony is DENIED.

b.  Jason Ludwig

Unlike their substantive arguments regarding Fabello's report, the Corizon Defendants do not object to Dr. Ludwig's qualifications or opinions themselves, but rather to the timing of his disclosure.[8]

"Rule 26 of the Federal Rules of Civil Procedure requires the parties to disclose the identities of each expert and, for retained experts, requires that the disclosure includes the experts' written reports." *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011). If a party fails to make this disclosure, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

In this case, Ocampo's expert disclosure deadline was February 12, 2019 (Dkt. 49), Defendants' expert disclosure deadline was April 11, 2019, and Ocampo's rebuttal expert disclosure deadline was May 13, 2019 (Dkt. 73, at 2). Ocampo disclosed Dr. Ludwig on May 13, 2019. Accordingly, The Corizon Defendants ask that the Court prohibit Ocampo from using Dr. Ludwig's opinion in their case-in-chief—now at summary judgment, and at trial.

Ocampo does not dispute that he did not disclose Dr. Ludwig until the rebuttal deadline, but claims that this was Corizon's fault and that, in any event, Corizon will not face any prejudice if Dr. Ludwig's report is allowed at this time. Specifically, Ocampo

---

[8] For context, the Court notes that Dr. Ludwig's opinion also relates to the standard of care Ocampo received—specifically, he disagrees with Corizon's experts' analysis that Ocampo received appropriate care in this case.

claims Corizon Defendants did not fairly supplement certain answers and interrogatories and, therefore, he was unaware of their expert opinions until they filed their reports. The Court disagrees.

First, Corizon did not have to disclose its experts until the deadline—which by design is *after* Ocampo's deadline. Although Corizon's failure to supplement its answers to interrogatories until after its experts' reports were filed does not further the purposes of Rule 1 or heed general notions of fair play in litigation, it is disingenuous for Ocampo to say that he did not know what Corizon's experts' opinions were going to be until the actual disclosure. This is an Eight Amendment case focusing on the standard of care provided to Ocampo. It stands to reason that Corizon Defendants' experts would opine that the care they provided was up to par. Receiving and reviewing those reports should have—and in fact did—alert Ocampo to the fact that he may need someone to rebut those conclusions.

Ultimately, it seems clear that Ocampo retained Dr. Ludwig *after* the Corizon Defendant's submitted their expert reports and specifically did so to rebuff Corizon's experts. While allowed under the rules, Ocampo's use of Dr. Ludwig's opinion must be within the appropriate parameters. Ludwig is a rebuttal expert and, therefore, cannot testify in Ocampo's case-in-chief—now or at trial. Critically, the late disclosure was not harmless to Corizon Defendants as they will have no opportunity to respond to Dr. Ludwig's opinions.[9]

---

[9] Again, by design, as with any rebuttal expert, Corizon would not have an opportunity to respond. But that is precisely the point. Ocampo can present Ludwig's testimony, but only as a rebuttal expert *at trial* based upon what evidence the Corizon Defendants elect to put on.

When recently faced with a similar decision, Judge B. Lynn Winmill noted that "Rule 56 motions are designed to test the sufficiency of the non-moving party's case-in-chief, and weed out cases which cannot be successfully presented at trial." *Ellis v. Corizon, Inc.*, No. 1:15-CV-00304-BLW, 2018 WL 6268199, at *4 (D. Idaho Nov. 30, 2018). Because a rebuttal witness "would only be allowed to testify at trial as to the contents of his report *after* [plaintiff] rest his case-in-chief" it stands to reason that the Court should not consider rebuttal expert opinion "in resolving any summary judgment motion filed in this case." *Id.* The Court agrees with this logic. Accordingly, Ludwig is limited to serving as a rebuttal witness at trial and his expert report will not be considered by the Court when ruling on the motions for summary judgment.

### 2. *Corizon's Second Motion in Limine (Dkt. 97)*

On October 10, 2019, in conjunction with the filing of their reply brief—and in direct response to Ocampo's responsive pleadings—the Corizon Defendants filed their second Motion in Limine. Dkt. 97. In this motion, the Corizon Defendants asks the Court to prohibit Ocampo from relying on certain declarations and facts brought to light in his responses to their motions for summary judgment. The objections fall into generally three categories: (1) witness declarations, (2) Ocampo's statement of facts, and (3) hearsay material. The Court will address each in turn.

### a. Sheldon, Young, and Bergstrom Declarations

First, the Corizon Defendants claim that in response to their discovery requests early on in this case, Ocampo only disclosed himself, the named defendants, and various treating medical providers as individuals who he may call to testify as witnesses at trial. Later, on

the eve of the close of fact discovery, Ocampo disclosed an individual named Christina Bergstrom as a potential witness. Then, on September 6, 2019—approximately four months *after* the close of discovery and one month after the dispositive motion deadline— Ocampo supplemented his responses to disclose two new potential witnesses—Kate Sheldon and Donald Young. One week later, Ocampo submitted declarations from Bergstrom, Sheldon, and Young in support of his opposition to Defendant's Motions for Summary Judgment.

The Corizon Defendants assert that none of the three witnesses should be considered by the Court.

Rule 26(e)(1)(A) of the Federal Rules of Civil Procedure requires that a party must supplement or correct its response to an interrogatory or a disclosure if the "response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Rule 37(c)(1) of the Federal Rules of Civil Procedure allows the court to sanction a party for failing to properly supplement and states that if "a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

Ocampo did not disclose Sheldon and Young until well after fact discovery had closed. In fact, it was during the pendency of briefing on the current motions that Sheldon and Young were disclosed. This is not appropriate. This late disclosure left no time for the

Corizon Defendants to depose these witnesses, conduct any discovery relative to them, or even consider them when filing dispositive motions.

Ocampo claims that he only recently discovered these two individuals vis-à-vis their involvement in the *Balla* litigation in the District of Idaho. Be that as it may, this does not excuse or justify the extremely late disclosure.[10] Ocampo endeavors to shift the blame and asserts that the Corizon Defendants knew about these individuals and that they (Corizon) should have brought them to his (Ocampo's) attention. Furthermore, Ocampo's counsel claims he was ethically prohibited from talking with Sheldon or Young because they were employed by Corizon at the time. While the second assertion is accurate, Ocampo's attorney could have received permission from Corizon to talk with Sheldon and Young if he knew of their existence and wanted to talk to them. But, hearkening to the first argument, it does not appear that Ocampo was aware of these individuals or their testimony until just recently. Further, Corizon is under no obligation to alert Ocampo to testimony or witnesses *in other litigation* that (by all accounts) is only tangentially related to the issues before the Court in this case. Ultimately, the Court finds no reasonable excuse for the late disclosure and will strike the declarations of Sheldon and Young.[11]

The same cannot be said, however, for Bergstrom's declaration. Ocampo disclosed Bergstrom during fact discovery (albeit with only two weeks remaining in discovery) and

---

[10] Ocampo did not file anything with the Court alerting it (or opposing Counsel) to this situation. The Court is not implying doing so would have changed the outcome today, but at the very least, some type of motion or notice—for example, to reopen discovery based on newly discovery evidence—would have been a more appropriate avenue to address the matter as opposed to simply filing the reports in the course of summary judgment briefing.

[11] In like manner, the Court will strike certain factual assertions contained in Ocampo's Statement of Facts (Dkt. 92-1) that rely on the Sheldon or Young declarations—namely those identified in Dkt. 97-1, at 10.

MEMORANDUM DECISION AND ORDER - 21

identified (albeit in a summary fashion) what he expected she would testify about. The Court has reviewed Bergstrom's declaration, finds it was timely, and will give it the weight it deems appropriate.

    b.  <u>Statement of Facts</u>

Next, the Corizon Defendants ask the Court to strike additional facts contained in Ocampo's Statement of Facts (Dkt. 92-1) based on Ocampo's failure to supplement his answers to contention interrogatories in such a way that Corizon Defendants were on notice he would rely on certain facts to support his case. Corizon Defendants assert that Ocampo gave generic answers to their contention interrogatories but now relies on very specific facts and that such is unduly prejudicial.

Ocampo counters that the Corizon Defendants' contention interrogatories were compound and vague and that his answers were appropriate.[12] Additionally, Ocampo contends he does not need to outline every minute fact or piece of evidence he intends to use and that doing so would invade the work product doctrine and disclose his legal strategy and mental impressions. Both sides take this matter to the extreme.

The Court does not support "boiler-plate" requests or "boiler-plate" responses. Notions of fair play in litigation, as well as the Court and Counsel's directive to "secure the just, speedy, and inexpensive determination of every action and proceeding," Fed. R. Civ. P. 1, mandate that parties tailor their requests and their answers so that the other side is fairly apprised of any claim or defense. Here, the Court has reviewed the interrogatories,

---

[12] In fact, Ocampo goes so far as to "object" to Corizon Defendants' contention interrogatories. The time to formally object, however, has long since come and gone. *See* Fed. R. Civ. P. 33(b)(4).

the answers, and the relied upon facts.

As noted, there are some requests and answers that are wanting. Additionally, there do appear to be some gaps or "jumps" from the *records before the Court* and Ocampo's stated facts. However, the parties in this case have undergone extensive discovery. The Court finds it hard to believe the Corizon Defendants were not at least on notice of the general facts Ocampo intended to assert—even if they were unaware of the specific facts he would actually use to support his contentions. In short, the Court will not strike the facts the Corizon Defendant's wish excised but will give them the weight it deems appropriate.

c. Hearsay

Finally, the Corizon Defendants assert that Ocampo relies on inadmissible hearsay statements in Paragraph 43 of his Statement of Facts in stating: "When NP Collins brought the issue up with HAS Fran Palazzo he told her that the situation would be taken care of, but that Corizon needed 'warm bodies.'" Dkt. 92-1, at 14.[13] In support of this claim, Ocampo cites to a memo prepared by NICI Warden Terema Carlin. This memo appears to be a transcription of something that NP Collins told Warden Carlin.

The Corizon Defendants assert this constitutes inadmissible hearsay and must be stricken. Under the circumstances, the Court must agree.

Hearsay is defined as a "statement, other than one made by the declarant while

---

[13] This situation is in reference to disagreements between certain staff members regarding the care of inmates—not necessarily Ocampo. Fran Palazzo is Corizon's Health Services Administrator. The general assertions here appear to be that there were disagreements between clinical staff, NICI staff, Corizon staff etc., and that this resulted in some hostility. While Ocampo uses this hostility to bolster his general assertions that the Corizon Defendants were not supervising their employees, the main purpose of this paragraph in his statement of facts seems to be related to his contention that Corizon staffed ill-equipped people (i.e. "warm bodies") at NICI.

testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).

Here, the memo is a written recording by Warden Carlin of something NP Collins told her (Carlin) that Fran Palazzo told her (Collins). In other words, there are multiple levels of hearsay here and no exception appears to apply.

Ocampo argues that the statements are not hearsay, but are admissible under the "party opponent" exception. Fed. R. Evid. 801(d)(2). Ocampo further suggests that Warden Carlin could be called to testify at trial to quell any fears the Court might have about her statements.

As to the former claim, the Court notes that Warden Carlin herself is not a party to this litigation and thus not a quintessential "party opponent." Whether Warden Carlin would qualify as such vis-à-vis her relationship with other named defendants might be a closer call. Even then, however, that only solves the first layer of the situation.[14]

The problem with the later assertion is more troublesome. Warden Carlin has not been listed as a witness in the present case, she was not deposed by either party, and, at this point, likely *cannot* testify at trial. There is simply no foundation for her statements. The Ninth Circuit has been clear that a "trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)). "Authentication is a *condition precedent* to admissibility,

---

[14] Additionally, the Court notes that NP Collins *is* a named party in this case, but Fran Palazzo is not. This further obscures whether the statements could be considered to have been made by a "party opponent."

and this condition is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *Id.* (quoting 7 Fed. R. Evid. 901(a)) (internal quotation marks omitted) (emphasis added). The Ninth Circuit has "repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment." *Id.*

Because Ocampo has not laid the proper foundation for Warden Carlin's hearsay memo and it is unauthenticated, the memo is inadmissible at trial, and, therefore, cannot be considered at summary judgment. The Corizon Defendants' Motion in Limine is GRANTED in this regard.

### 3. *Analysis of the Corizon Defendants' Motion for Summary Judgment*

Having dealt with the various evidentiary motions, the Court now turns to Corizon Defendants' substantive arguments in support of their motion for summary judgment.

The Eighth Amendment to the United States Constitution protects prisoners against cruel and unusual punishment. To state a claim under the Eighth Amendment, a prisoner must show that he is "incarcerated under conditions posing a substantial risk of serious harm," or that he has been deprived of "the minimal civilized measure of life's necessities" as a result of defendants' actions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). An Eighth Amendment claim requires a prisoner plaintiff to satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir.2012). The Eighth Amendment includes the right to adequate medical care in prison, and prison officials or prison medical providers can be held liable if their "acts or omissions [were] sufficiently harmful to evidence deliberate

indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

As for the objective standard, the Supreme Court of the United States has explained that "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

As to the subjective standard, a prison medical provider acts with "deliberate indifference . . . only if the [provider] knows of and disregards an excessive risk to inmate health and safety." *Gibson v. Cnty. of Washoe*, *Nev*., 290 F.3d 1175, 1187 (9th Cir. 2002) (internal quotations and citations omitted). Mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Labs*., 622 F.2d 458, 460 (9th Cir.1980) (per curiam).

Ultimately, upon an exhaustive review of the record in this case, the Court cannot find as a matter of law that Corizon Defendants were deliberately indifferent to Ocampo's serious medical needs. Summary judgment is, therefore, appropriate.

As a threshold matter, the Court must discuss vicarious liability. It will then address Ocampo's care and treatment as well as his interactions with specific Corizon Defendants.

It is a long-standing principle that there is no vicarious liability in § 1983 actions. *See Monell v. Dept. of Social Services,* 436 U.S. 658 (1978). To assert a § 1983 claim against a private entity—such as Corizon—a Plaintiff must meet the test articulated in *Monell* which requires that the Plaintiff show: (1) the plaintiff was deprived of a constitutional right; (2) the municipality or entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4)

the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty.,* 237 F.3d 1101, 1110–11 (9th Cir. 2001).

For an entity to be found liable under *Monell*, the unwritten policy or custom must be so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell,* 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–168 (1970)). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates,* 99 F.3d 911, 918 (9th Cir.1996).

In this case, Ocampo calls into question numerous practices of the Corizon Defendants. For example, Ocampo asserts that Defendants had policies or customs of "understaffing"  its correctional medical units because it needed "warm bodies"; of allowing certain individuals with limited medical skill to exceed their expertise; of "scrubbing" or falsifying records; of using patients' vital signs as pretext for not seeking necessary medical care; of not following its own protocols in filling out forms and consulting specific medical personnel; and of generally delaying and denying medical care.

An overarching problem with Ocampo's *Monell* claim, however, is that many of the assertions are based on his opinion of what is correct and/or rely on misunderstandings of Corizon's policies.

For example, Ocampo takes issue with Corizon staffing its medical units with CMS's who are not licensed medical professionals. While CMS's are not "licensed," per Idaho law they are allowed to practice limited medical and nurse care under a physician's

supervision—similar to a medical assistant. *See* Idaho Code § 54-1804(1)(h); IDAPA 23.01.01.490. Corizon's policies and procedures outline that medical decisions must be made by qualified health care professionals and that qualified health care professions include "physicians, physicians assistants, nurses, nurse practitioners, dentists, mental health professionals, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for patients." Dkt. 92-3, at 2. Per Corizon policy—and by law—CMS's are allowed to provide inmates with medical care. In a similar vein, there is no merit to the supposition that Corizon employs ill-qualified or unprofessional medical staff because it needed warm bodies to fill employment slots.[15]

As another example, Ocampo claims that Corizon has a "normal vital signs" policy whereby medical staff use an inmate's vital signs as justification for denying timely and accurate treatment. This allegation is without support in the record. To be sure, Defendants review and explain at length Ocampo's vital signs, but not as an excuse for their behavior, but rather as an explanation for the course of treatment they developed and provided for Ocampo. As RN Gause explains, reviewing and tracking vital signs is part of the medical care all patients receive, and such a procedure was followed in this case. *See generally* Dkt. 83-14. Interestingly, it was *in spite of* Ocampo's normal vital signs in this case that medical professionals eventually determined it was best to transport Ocampo to the hospital for further care.

Finally, Ocampo spends a great deal of time discussing Corizon's policy requiring

---

[15] As was just discussed, Ocampo's evidence in support of this assertion (the Warden Carlin document) is inadmissible.

medical personnel to fill out Nursing Encounter Tools ("NETs") each time they interact with an inmate for a medical issue. NET's are written instructions or guidelines that specify steps to be taken in determining a patient's health status and treatment. The overarching purpose of a NET is to create a clear record of a patient's condition. NET's also outline how to escalate a situation to other medical professionals—should such become necessary. The problem, however, is that Ocampo cannot cite to anything that actually supports his claim—i.e. he cannot point the Court to anything that actually mandates the use of NETs. Corizon's policies explain the functionality and use of NETs (Dkt. 92-4, at 12-13) but do not specifically require their use in all circumstances. To be sure, there is evidence in the record that employees were, from time to time, reprimanded for *not* using NETs, or other tools, to track an inmate's medical progress. Critically, however, there is nothing supporting the idea that a NET *must* be used each time an inmate is seen for medical needs and/or that the failure to do so is a violation of any Corizon policy or procedure.

In short, Ocampo is trying to make this case into a *Monell* case, when it simply is not. There is no pervasive, persistent, or widespread policy that deprived him—or any other inmate—of any constitutional rights. Ocampo's *Monell* claims cannot withstand scrutiny because there is no evidence to support such a finding.

The Court now turns to Ocampo's specific treatment and the actions of the individual Corizon Defendants. None of the Defendants in this case contest Ocampo's conclusion that his medical condition was serious—the first prong of the Court's Eighth Amendment inquiry. They simply dispute Ocampo's assertions that their actions were deliberately indifferent to Ocampo's serious medical need—the second prong of the test.

Accordingly, the Court focuses its discussion solely on the second, subjective standard: Defendants' behavior.

As detailed above in the background section, over the course of approximately four days, no less than five medical staff attended to Ocampo,[16] on no less than seven different occasions. During the course of Ocampo's treatment, these individuals utilized the information available to them at the time, and suggested appropriate treatment—based on their education, experience, and expertise. At no time was it apparent that there was an emergent situation with Ocampo. His vitals were essentially normal up through the time of his hospitalization and he was being treated with a strong regimen of antibiotics—at the recommendation of multiple medical professionals. Throughout Ocampo's treatment at NICI, there were no indications that Ocampo was at a "substantial risk of serious harm." *Toguchi*, 391 F.3d at 1057. When it became evident, however (to RN Shriver and NP Collins) that Ocampo needed additional treatment beyond what could be provided by the prison medical staff, they immediately transferred Ocampo to a local hospital.

Corizon has presented the declarations of two experts—one of whom is a dentist, the other, a registered nurse who has worked in the correctional health system for decades—affirming that the actions taken by Corizon medical staff, including communicating with licensed medical staff, properly prescribing antibiotics when Ocampo first showed signs of a potential infection, authorizing stronger antibiotics the next day when Dr. Schaff was consulted, and appropriately waiting for the antibiotics to kick in,

---

[16] Gentry, Dunning, Schmitt, Shriver, and Bolin. Additionally, Dr. Schaff and NP Collins were consulted—albeit they were not physically present.

were all understandable and proper under the circumstances. Dkt. 83-12; Dkt. 83-14.

The Court notes that by all accounts Ocampo's treatment involved a developing situation and that not all diagnoses made by staff were correct. For instance, while providers were incorrect in diagnosing Ocampo with strep throat, they did appropriately identify Ocampo had an infection. As it turns out, they were mistaken as to the *extent* of the infection, but even assuming arguendo that all the medical professionals had completely misdiagnosed Ocampo's condition, such cannot support an Eighth Amendment claim. *See Estelle*, 429 U.S. at 107 (finding that decisions to take (or not take) certain medical actions do not represent cruel and unusual punishment and that mere negligence—or even medical malpractice—regarding a medical diagnosis cannot support an Eighth Amendment claim).

To turn a phrase, Ocampo is claiming that medical treatment delayed is medical treatment denied and while it is true that a prisoner can establish deliberate indifference by showing that a delay in treatment was "medically unacceptable," s*ee, e.g., Jackson v. McIntosh,* 90 F.3d 330, 332 (9th Cir.1996), there is nothing in the record to indicate any of the defendants here "den[ied], delay[ed], or intentionally interfere[d] with [Ocampo's] medical treatment." *Id.*

To the contrary, medical staff in this case diagnosed Ocampo's medical issue, prescribed appropriate medications, waited and observed, contacted other medical professionals, reviewed and undertook further diagnosis, and ultimately sent Ocampo to a hospital when Ocampo's infection continued to progress. The fact that such efforts were unhelpful—now knowing in hindsight that Ocampo had Ludwig's Angina—does not mean that they were medically unacceptable or deliberately indifferent. *See e.g., Ross v. Ortiz*,

No. EDCV 10-1606-SJO JPR, 2013 WL 3923487, at *12 (C.D. Cal. July 29, 2013), *aff'd*,

587 F. App'x 434 (9th Cir. 2014) (finding the denial of immediate access to a specialist in

a nonemergency situation does not amount to deliberate indifference); *Heidtke v. Corr.*

*Corp. of Am.,* 489 F. App'x 275, 277, 280–81 (10th Cir. 2012) (finding a doctor was not

deliberately indifferent for failing to detect particularized injury because he provided

treatment consistent with symptoms and actively monitored inmate's condition).

The Court next briefly address the individual Corizon Defendants' actions.

a.  <u>LPN Bolin</u>

Ocampo alleges that LPN Bolin was deliberately indifferent to his medical needs

because he failed to use a NET on the evening of May 2, 2016 (the only time LPN Bolin

interacted with Ocampo). As already explained, however, LPN Bolin was not required by

Corizon's policies to fill out a NET.[17] Rather, he had been tasked with checking on Ocampo

after he was put on medical watch. Bolin's limited interactions with Ocampo do not give

rise to a claim of deliberate indifference.

b.  <u>LPN Schmitt</u>

Ocampo argues that LPN Schmitt was deliberately indifferent to his medical needs

because she did not use a NET when evaluating him on May 2 or May 3. Again, Ocampo

is incorrect that there is a "written protocol" mandating the use of NETs.

---

[17] The Court notes that this *type* of argument, however, is not wholly without foundation. Even if Corizon did not have a policy of requiring NETs, this non-policy could, nonetheless, still support a *Monell* claim if Ocampo could present facts suggesting that NETs *should have* been required for constitutionally adequate care. *See e.g., City of Canton, Ohio v. Harris,* 489 U.S. 378, 390 (1989) (finding a "policy" of not adequately training prison employees to recognize a detainee's medical needs could support a *Monell* claim). That said, Ocampo has not made such a showing in this case.

Additionally, Ocampo contends that LPN Schmitt was deliberately indifferent when she called Dr. Schaff without fully examining him, alleging that had she done so, Dr. Schaff would have had a "full clinical picture" and might have recognized the Ludwig's Angina sooner. While this is a possibility, it is just that: possible, not settled. Based upon the information they had at the time, LPN Schmitt and Dr. Schaff made a reasonable decision. Corizon's dental expert has affirmed that this decision was acceptable under the circumstances and states his belief that while the antibiotics did not ultimately stop the infection, they very likely "slowed the progress and the outcomes may have been worse had they not been used." Dkt. 83-12, at 4-5. In short, Ocampo cannot argue that LPN Schmitt's call to Dr. Schaff, in accordance with Corizon policy, constituted deliberate indifference—even if the course of treatment turned out to be insufficient for the ultimate diagnosis.

### c. NP Collins

Finally, Ocampo claims that NP Collins—whom he never actually saw in person— acted with deliberate indifference towards him. First, Ocampo claims that because other people did not do their jobs (i.e. because others failed to refer him to NP Collins—the qualified medical provider) she was unable to provide him with adequate care. Second, Ocampo claims that when NP Collins was contacted, her actions were so delayed that they constitute deliberate indifference.

Ocampo's first assertion is difficult to swallow. As has been noted, each of the Defendants here met Corizon's definition of qualified medical provider and were authorized to treat Ocampo. It is also difficult to blame NP Collins' inaction on other

individuals' inaction. Even taking Ocampo's claims as true, NP Collins would not be liable for *another employee's* failure to contact her.

Second, Ocampo's assertion that NP Collins delayed treatment seems to rest on the fact that it took some time for her to get back to RN Shriver about whether to transport Ocampo to the hospital or not. While there was a slight delay—due to cellular service availability—once NP Collins received a phone call from RN Shriver, she requested a picture of Ocampo to determine whether he should be transported to the hospital, and then ultimately authorized Ocampo to be taken to the emergency room. While this process took some time, it was part and parcel to diagnosing, analyzing, and determining what was best for Ocampo. Ocampo cannot point to any objective facts indicating NP Collins was deliberately indifferent to his needs and the Court finds her behavior was appropriate.

In summary, Ocampo has not presented any evidence that Corizon Defendants "[knew or disregarded] an excessive risk to [his] health and safety." *Gibson,* 290 F.3d at 1187. At most, he has pointed to shortcomings or minor delays within the scope of his treatment, but even assuming these actions constituted negligence (or even medical malpractice) such is insufficient to support a cause of action under the Eighth Amendment. *Broughton,* 622 F.2d at 460.

Upon review, and for the reasons set forth above, the Court finds no disputed facts that could be resolved in Ocampo's favor. Accordingly, the Court GRANTS the Corizon Defendants' Motion for Summary Judgment.

## B. Dunning's Motion for Summary Judgment (Dkt. 79)

The Court begins by addressing CMS Dunning's Motion for Summary Judgment

(Dkt. 79) and will then analyze his Motion to Strike (Dkt. 101).

Ocampo contends that Dunning was deliberately indifferent to his serious medical needs because he failed to refer Ocampo to a qualified medical provider and because he practiced medicine outside of the scope of his CMS license. The Court will address each contention in turn.

1. *Deliberate Indifference in Providing Treatment to Ocampo*

As noted, an Eighth Amendment claim requires a prisoner plaintiff to satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir.2012) (*overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014)).

Exhausting the facts, the record shows that Dunning's interactions with Ocampo were limited to two separate occasions: the morning of May 1, 2016, and a follow up the same day at noon. After seeing Ocampo in the morning, Dunning referred Ocampo to "nurse/corizon" for a follow up, and after seeing Ocampo again in the afternoon, Dunning referred Ocampo to another qualified medical provider. At no point during Ocampo's care did Dunning portray deliberate indifference to Ocampo's need for further medical treatment. He instead repeatedly referred Ocampo to a qualified medical provider for further evaluation. Ocampo's first contention is without merit.

At the time he treated Ocampo, Dunning had been a CMS since 2004, and had 12 years of prior medical experience, training, and testing in various clinical skill disciplines pertinent to his role as a CMS. On May 1, 2016, Dunning utilized his prior experience and

acted within the scope of his duties to make a reasonable assessment of Ocampo's medical needs. Specifically, Dunning evaluated Ocampo, diagnosed the issue as strep throat, and administered antibiotics.

Dunning provided appropriate medical care to Ocampo, and while Ocampo argues (now) that what Dunning did was not the best course of action, Dunning was not acting with deliberate indifference at the time. To demonstrate deliberate indifference, Ocampo must show Dunning purposefully withheld a qualified medical provider from Ocampo. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (finding a plaintiff must show a purposeful act or failure to respond to his pain or possible medical need to establish deliberate indifference). The facts show Dunning assessed Ocampo, followed up, and referred Ocampo to a nurse for additional treatment. That Dunning was ultimately incorrect as to Ocampo's medical diagnosis (i.e. that he was not, in fact, suffering from strep throat) does not change the Court's analysis. "Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). Given Ocampo's symptoms and recent exposure to strep throat by a fellow inmate, the Court cannot find Dunning was even negligent in incorrectly diagnosing Ocampo's condition.

Ocampo also argues Dunning exhibited deliberate indifference by telling Ocampo to "cowboy up" in response to Ocampo's complaint of significant pain. Ocampo argues this statement was similar to *Snow v. McDaniel,* where a physician's assistant made a comment to the effect that he was "gonna let [the patient] suffer" in response to the patient's inquiry about adequate pain medication. 681 F.3d at 990. The Court in *Snow* determined

that the physician's comment was a "textbook example of the state of mind required to violate the Eighth Amendment." *Id.* The Court finds the present situation distinguishable.

The context of Dunning's statement must be considered. While arguably a poor choice of words and a bit flamboyant, Dunning's comment was frankly appropriate, considering the fact that when he said these words, he had just given Ocampo antibiotics, sincerely believed Ocampo had strep throat, and was simply waiting for the medications to take effect—which required waiting out the pain for a time. Ultimately, the facts do not show that Dunning was specifically trying to withhold a qualified medical provider from Ocampo or was purposely letting him suffer.

The Court finds that Dunning provided reasonable and appropriate treatment based on the information Ocampo provided, Ocampo's symptoms, and in compliance with Corizon's policies. Further, Dunning was not deliberately indifferent to Ocampo's serious medical need by withholding a medical provider. Dunning himself was a medical provider, and he also twice referred Ocampo to others with more experience than he possessed.

### 2. Scope of Practice as a CMS

Ocampo next alleges that Dunning was deliberately indifferent to his serious medical needs because Dunning delayed referring him to a qualified medical professional by practicing medicine without a license. Ocampo further argues that a CMS is not a licensed or qualified medical professional.

As already noted, while CMS's are not "licensed," they are allowed to practice limited medical and nursing care under a physician's supervision per Idaho law. *See* Idaho

Code § 54-1804(1)(h); IDAPA 23.01.01.490. Per Corizon policy—and by law—CMS's are allowed to provide inmates with medical care.

Corizon's policy further explains that each CMS has a supervising physician that establishes the scope of the CMS's practice. Dkt. 92-5, at 3. The scope is defined and documented in a "Scope of Practice and Skills Proficiency Checklist" and is based on the results of a skills examination, the requirements of the job description, and the knowledge and experience of the CMS. *Id.*

To illustrate Dunning's shortcomings, Ocampo references *Rosati v. Igbinoso,* and the Ninth Circuit's holding that "access to the medical staff has no meaning if the medical staff is not competent to deal with the prisoners' problems." 791 F.3d 1037, 1040 (9th Cir. 2015). While this is assuredly a correct principle, per Corizon's policy—and under Idaho law—Dunning *was* competent and authorized to provide Ocampo with medical care. Again, Dunning had many years of experience in the medical field and specifically, on May 1, 2016, provided inmate Ocampo with reasonable and *lawful* medical care.

Delving deeper into Corizon's policy, the Court notes that in 2016, Clayton Bunt, MD, signed and acknowledged Dunning's proficiencies in Dunning's Annual Proficiency Checklist. These proficiencies were vast, and included, but were not limited to, "Head to toe assessments, focused assessments, and complete vital sign assessments." Dkt. 92-5, at 9. Dunning provided just that to Ocampo on May 1, 2016: a reasonable medical assessment in line with the scope of his duties.

In summary, to demonstrate deliberate indifference, the facts must be sufficient to indicate Dunning had a culpable state of mind. Here, the facts do not support a finding that

Dunning acted with deliberate indifference. In fact, they show he provided reasonable medical care to Ocampo based upon the information Ocampo provided and under the authority given to him by Idaho law and under Corizon's policies.

Further, unlike the plaintiff in *Rosati* (regarding Dunning's incompetence) the Court finds that based on Dunning's experience, his signed annual proficiency checklist, and the actual care he provided to Ocampo on May 1, 2016, Ocampo did in fact have access to competent medical staff and Dunning provided appropriate care to Ocampo in accordance with Corizon's policies and the scope of his job responsibilities.

As a result, the Court must GRANT Dunning's Motion for Summary Judgment.

3.  *Dunning's Motion to Strike (Dkt. 101).*

Finally, Dunning asks the Court to strike any references made by Ocampo to his employee file, specifically his alleged "character" and any acts of unprofessional conduct toward corrections staff, medical providers, and patients, as well as any references to disciplinary action or his eventual termination from Corizon. Dkt. 101.

Dunning argues that all references made by Ocampo regarding his character are inadmissible and do not show deliberate indifference to Ocampo's health and safety. The Court will analyze the alleged instances of Dunning's conduct and their admissibility pursuant to Federal Rules of Evidence 401, 402, 403, and 404.

a.  Admissibility of Character Evidence

Ocampo contends that Dunning's unprofessional conduct, disciplinary actions, and termination from Corizon are relevant to show that he intentionally acted with deliberate indifference to Ocampo's serious medical needs on May 1, 2016.

Under Rule 401, evidence is relevant if "it has any tendency" to make a "fact of consequence in determining the action" any "more or less probable than it would be without evidence." Irrelevant evidence is not admissible. Fed. R. Evid. 402. When further considering whether facts of relevancy are appropriate, Rule 403 provides that relevant evidence may be excluded if its value is substantially outweighed by a danger of unfair prejudice, confusing or misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403.

Ocampo argues that Dunning's work history, unprofessional conduct, disciplinary action, and termination are all relevant to show his deliberate indifference to Ocampo's serious medical need. The Court disagrees. It is undisputed that Dunning had instances of unprofessional conduct in the workplace. The dispute, however, is whether Dunning's comments, actions, and unprofessional conduct in the past have any tendency to make more probable than not the argument that he deliberately disregarded *Ocampo's serious medical needs on May 1, 2016*. Ocampo's references to Dunning's rude comments about past patients and frustrations with NP Collins are unrelated to the care Dunning provided to Ocampo. Further, allowing evidence of Dunning's prior actions do not make it more probable that he acted with deliberate indifference to Ocampo's serious medical needs during the course and scope of his treatment.

It is undisputed that Dunning saw Ocampo the morning of May 1, 2016, and again at noon, and that on both occasions he assessed Ocampo and spent considerable effort trying to help Ocampo with his pain. When applying Rule 401, relevant facts would be any facts that might show Dunning was deliberately indifferent to Ocampo's serious medical

needs on the day he treated Ocampo. The references made by Ocampo regarding Dunning's past conduct do not reveal that Dunning knew or had reason to know of an excessive risk to Ocampo's health and purposefully chose to disregard such risks.

Even if these other acts were relevant, under Rule 403, they may be excluded due to unfair prejudice, confusion, or the prospect of misleading a jury. The Court agrees with Dunning that the probative value of his past unprofessional acts is outweighed by the danger of unfair prejudice or misleading a jury.

Finally, Federal Rule of Evidence 404(a)(1) provides "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with their character or trait." The primary purpose of Rule 404 is the fundamental notion that cases should be decided on the facts concerning the events at issue rather than the jury's frame of mind toward a party's character.

Although some of Dunning's comments—for example about a mentally ill inmate or his frustrations with NP Collins—are undoubtedly unprofessional, they should not be used to theorize how Dunning acted on May 1, 2016, in relation to Ocampo's serious medical needs. In accordance with Rule 404, references made by Ocampo to undermine Dunning's character are not admissible to prove he acted with a deliberate indifference to Ocampo's health and safety.

The Court concludes that permitting the trier of fact to punish a person because of their respective character is specifically what Rule 404 seeks to protect. Accordingly, the references Ocampo made regarding Dunning's unprofessional conduct, disciplinary actions, or termination cannot be connected to the care provided to Ocampo on May 1,

2016, nor do the references show Dunning was deliberately indifferent to Ocampo's serious medical needs. These statements will be STRICKEN.

### b. Admissibility of Crimes, Wrongs, and Other Acts

Ocampo claims that Dunning's history of unprofessional conduct, disciplinary actions, and termination show his deliberate indifference to Ocampo's serious medical needs. In particular, Ocampo points to a situation in December of 2015 where Dunning disagreed with NP Collins regarding proper protocols about obtaining a culture from an inmate who she suspected may have had MRSA. Apparently, Dunning got mad, hung up on NP Collins, and then called a different prison and spoke antagonistically about NP Collins. A similar situation occurred in January of 2017 when Warden Krieger spoke to Dunning regarding a mentally ill inmate, and, Dunning used less than favorable words in reference to the inmate.

Under Rule 404(b)(1), "evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). For the evidence to be admissible, the Court must determine whether the other act "evidence is probative of a material issue other than character." *Huddleston v. United States*, 485 U.S. 681, 686 (1988). In other words, here, the Court must find the evidence of Dunning's unprofessional conduct, disciplinary actions, and termination from Corizon are probative to prove

Dunning's intent, motive, or plan to be deliberately indifferent to Ocampo's serious medical needs on May 1, 2016.

Upon review, the Court concludes that absent an applicable exception, the evidence provided by Ocampo to portray Dunning's character is not admissible. The exceptions all focus on whether the evidence would be probative of a material issue other than character. Here, the material issue is whether Dunning had the state of mind of *deliberate indifference* toward Ocampo's serious medical need on the day of May 1, 2016.

Dunning's conversation with a correction officer in January of 2017 regarding a mentally ill inmate, and the December 2015 incident where Dunning disagreed with NP Collins about protocol for testing an inmate for MRSA infection, are distressing. That aside, Dunning's past actions cannot be broadened to the point of assuming his state of mind on May 1, 2016. The Court agrees Dunning had moments where his actions were unprofessional. The evidence of those actions, however, do not prove Ocampo's theories that it was Dunning's intent, motive, or plan to deliberately ignore Ocampo's serious medical needs on May 1, 2016.

Even if the acts were relevant to prove Dunning's intent on May 1, 2016, as already explained, such acts could nonetheless be excluded under Rule 403. Similar to the Court's holding above, the probative value of Dunning's past unprofessional acts, disciplinary actions, and termination from Corizon are outweighed by the danger of unfair prejudice, confusion, or misleading a jury. These comments, too, will be STRICKEN.

In sum, the Court finds that Dunning's historical acts do not prove Ocampo's theory that he was deliberately indifferent to Ocampo's serious medical needs on May 1, 2016.

For the foregoing reasons, and pursuant to Fed. R. Evid. 401, 402, 403, and 404, the Court GRANTS Dunning's Motion to Strike.

### C. **Crowl's Motion for Summary Judgment**

#### 1. *Introduction*

Ocampo's allegations involving Lt. Brian Crowl revolve around a short telephone conversation between Crowl and a female correctional officer[18] who relayed Ocampo's medical situation to Crowl and back. Specifically, the motion for summary judgement focuses on Ocampo's request that Crowl move beyond the directives of on-site healthcare professionals in order to provide him care for the pain he was experiencing after his tooth extraction surgery. Upon relay of information about Ocampo's condition from the officer, Crowl advised the officer to tell Ocampo that ibuprofen was available but that no emergency transportation to outside medical services would take place at that time.

Based on this interaction facilitated by the officer, Ocampo has raised multiple negligence-based claims under state and federal law against Crowl. Crowl seeks summary judgment on such claims. Additionally, a motion to strike is at issue based on the potential lack of personal knowledge and hearsay involved in the conversation between Crowl, the officer, and Ocampo.

---

[18] In briefing (Dkt. 104) and at oral argument, Ocampo indicated that the parties are relatively certain that this unnamed officer is an individual named "Officer Donna Mader." Because the Court does not know this individual's full name, and because it has not been conclusively established that Mader was the officer who spoke to Crowl over the phone, the Court will simply refer to this person as the unknown officer or simply "the officer." The person's identity, or lack thereof, is not dispositive of any facts at issue with respect to Crowl's Motion for Summary Judgment.

2. *Analysis*

    a. <u>Motion for Summary Judgment</u>

Ocampo bases his negligence claims against Crowl in this case on two main premises: 1) that Crowl's acts or omissions caused Ocampo excess pain, and 2) that Crowl failed to properly train and supervise his staff. Dkt. 34, at 15-17. Crowl addressed both assertions in his motion for summary judgment (Dkt. 82), however Ocampo only addressed the acts or omissions negligence claim in his response (Dkt. 90). As Ocampo declined to defend his claim of negligent supervision and training on summary judgment, summary judgment is appropriate on that claim. *See Fifer v. United States*, 649 F. App'x 426, 428 (9th Cir. 2016) (prisoner waived any state negligence claim against prison officials by failing to raise it in opposition to the defendant's motion for summary judgment).

In order to establish a claim of negligence against a governmental entity, Ocampo must meet the three-part test outlined in *Rees v. State, Dept. of Health & Welfare*, 137 P.3d 397, 401–02 (2006). First, Ocampo must demonstrate an applicable Idaho law that provides recovery for the alleged tort; next, that no exception to liability under the Idaho Tort Claims Act ("ITCS") applies; and finally, he must prove that he is entitled to recover based on the merits of his negligence claim. *Sherer v. Pocatello Sch. Dist. No. 25*, 148 P.3d 1232, 1236 (2006). The parties agree that Idaho Tort Claims Act provides a cause of action for negligence, however they disagree as to whether an exception applies to shield Crowl from liability. Idaho Code provides:

    A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent and without

gross negligence or reckless, willful and wanton conduct as defined in section 6-904C, Idaho Code, shall not be liable for any claim which:

(5) Arises out of any act or omission providing or failing to provide medical care to a prisoner or person in the custody of any city, county or state jail, detention center or correctional facility.

Idaho Code § 6-904B(5).

The parties focus on whether Crowl's acts or omissions constitute gross negligence or reckless conduct that would remove his governmental entity liability shield. Under Idaho Code section 6–904B, a showing of gross negligence entails "evidence showing not only the breach of an obvious duty of care, but also showing deliberate indifference to the harmful consequences to others." *See S. Griffin Const., Inc. v. City of Lewiston*, 16 P.3d 278, 286 (2000). In this case, therefore, Ocampo must show that he had a substantial risk of serious harm, that Crowl *knew* of this substantial risk, and that Crowl *intentionally* disregarded the risk. *See Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1187 (9th Cir. 2002). If no duty was present, or if Ocampo fails to show deliberate indifference as defined above, the negligence claim fails and Crowl is not liable.

Upon a full review of the record, it is clear that no reasonable jury could find Crowl's acts or omissions meet the rigorous standard of deliberate indifference to Ocampo's medical needs. First and foremost, Ocampo testified that he *did not* believe Crowl intentionally caused him any harm—contradicting his own claim that Crowl deliberately acted to cause him harm. Dkt. 82-3, at 20. Second, Crowl's suggestion that ibuprofen was available to Ocampo demonstrates—even if just to a small degree—his efforts to alleviate Ocampo's pain. Moreover, the suggestion of a mild pain medication

does not show that Crowl was aware of, and indifferent to, any substantial risk of harming Ocampo. Instead, it illustrates that Crowl attempted to alleviate Ocampo's pain, even if such attempt was ultimately ineffective. Thus, the Court finds that Crowl is entitled to immunity under Idaho Code section 6-904B.

Even assuming, *arguendo*, that Crowl is not entitled to immunity, the facts of the case do not lend itself to a finding of indifference. For example, in *Lolli v. County of Orange*, the Court found the defendant was deliberately indifferent to a prisoner plaintiff's medical needs because the "risk was obvious" based on the "obviously sickly appearance" of the prisoner's behavior. 351 F.3d 410, 421 (2003). Crowl, not having actually seen Ocampo in this case, did not have the ability to make emergency determinations based on Ocampo's appearance and behavior as did the defendant in *Lolli*.

To be sure, Crowl owed a general duty of care to Ocampo, however, the circumstances in this case do not illustrate that Crowl breached that duty. While IDOC's Standard Operating Procedures provide that emergency dental health care provisions include "elimination of infection" and "relief of pain," such provisions are premised on a dental emergency.  Dkt. 90.  Ocampo was seen by on-site medical staff shortly after requesting that Crowl send Ocampo out for emergency medical services. Those individuals determined Ocampo was not experiencing a dental emergency. Dkt. 82-3. Crowl is not a medical professional and was entitled to rely on the medical professionals at the facility and their assessment of Ocampo. *See McGee v. Adams*, 721 F.3d 474, 483. (7th Cir. 2013).

Further, while Crowl does have authority to send prisoners out of the facility for healthcare in emergency circumstances such as a prisoner not breathing, loss of blood,

MEMORANDUM DECISION AND ORDER - 47

imminent danger, or life-threatening harm, none of these conditions were present in this case. Simply put, Crowl had no credible information at his disposal (besides Ocampo's personal statements) that would have required him to override the on-site health care professionals' assessment of Ocampo's condition. Dkt. 82. Though the emergency list above is not exhaustive, it was not unreasonable for Crowl to rely on such bright line standards, particularly where he also relied upon assessments made by the on-site medical professionals who had tended to Ocampo's medical situation over the previous days.

There is no clear evidence that Crowl knew of a substantial risk to Ocampo and was deliberately indifferent to that risk. While Crowl has a duty in emergency situations to get prisoners healthcare, the circumstances at the time did not lend themselves to either Corizon staff, or Crowl, believing Ocampo was experiencing an emergency. As neither the duty nor the subjective indifference prongs of the deliberate indifference test are met here, Crowl is entitled to immunity under the negligence standard.

In looking to Ocampo's other claim regarding Crowl's purported reckless disregard by failing to override medical providers, much of the aforementioned analysis applies. In sum, Ocampo has failed to make an adequate showing that Crowl recklessly disregarded Ocampo's medical needs. As previously noted, in order to show objective indifference under 42 U.S.C. § 1983, a plaintiff must meet a two-part test: first, the plaintiff must demonstrate a constitutional right was violated; and second, the plaintiff must show that the offender reasonably understood that his or her conduct was violating the plaintiff's constitutional rights. *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 971 (9th Cir. 2005). The subjective indifference standard provides that a

prison official must know of, and disregard, an "excessive risk." *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1187 (9th Cir. 2002). As discussed above, neither Crowl's knowledge of, nor indifference to, such an excessive risk has been shown.

As both the subjective and objective standards are required, and the facts of this case do not support a finding of subjective deliberate indifference, the federal claim for reckless disregard in failing to override medical professionals does not survive. Even if a jury could find that both subjective and objective indifference were present, Crowl would be entitled to qualified immunity under Idaho Code section 6-904B since no facts suggest that Crowl knowingly violated the law. *See Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) ("If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.") (internal citations and alterations omitted). Accordingly, summary judgment is appropriate.

### b. Motion to Strike

The Court turns next to Crowl's Motion to Strike. Dkt. 95. In this Motion, Crowl seeks an order striking numerous statements from Ocampo's Declaration and Statement of Facts regarding the aforementioned telephone conversation. Dkt. 95. As noted, this conversation allegedly involved Crowl and an officer who was simultaneously relaying Crowl's information to Ocampo. In his Motion to Strike, Crowl asserts that many of the statements Ocampo suggests were made are either not based on personal knowledge or are inadmissible hearsay.

In a summary judgment ruling, only admissible evidence is considered by the court. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002). To be admissible, evidence

must first be relevant. Under Federal Rule of Evidence 401, evidence is considered relevant when it has "any tendency" to make a fact more or less probable. Because the conversation at issue is relevant to whether or not there is a cause of action against Crowl for deliberate indifference, the conversation in question meets the relevancy requirement.

Federal Rule of Evidence 602 requires that witnesses testify only to information based upon personal knowledge. *Anheuser-Busch, Inc. v. Nat. Beverage Distributors*, 69 F.3d 337, 345 (9th Cir. 1995). Personal knowledge is described as information obtained from one's own senses and observations. *See Wigmore on Evidence: Evidence in Trials at Common Law*, § 657 (4th ed. 2019-3 Cum. Supp. 1985). Construing the facts in the light most favorable to the nonmoving party, Ocampo was physically present with the unknown officer and engaged in dialog with her. Ocampo can testify to the conversation he engaged in between himself and the unknown officer, as that portion of the conversation is based on Ocampo's own personal observations of the interaction.

However, relevant evidence such as out of court statements that are hearsay may be barred under Federal Rule of Evidence 801(c) if the statements go to prove the truth of the matter asserted. In this case, Ocampo emphasizes this conversation to illustrate that Crowl was put on notice of Ocampo's medical situation and, thereafter, acted with deliberate indifference. Ocampo is not using this conversation to show that he was in fact in pain or to prove the level of necessarily medical care. Because the evidence of the out of court statements goes to show notice, it is not immediately barred as hearsay.

That said, Crowl's statements that were not directly witnessed by Ocampo or that could be considered outside of Ocampo's general knowledge would be considered hearsay

if used to go to the truth of the matter, unless there is an applicable hearsay exception. Whether Ocampo can testify to Crowl's statements requires examining the two potential applicable exceptions enumerated by the parties: 1) Federal Rule of Evidence 801(d)(2)(A) and 2) Federal Rule of Evidence 801(d)(2)(D).

Federal Rule of Evidence 801(d)(2)(A) provides that a statement is not hearsay if made by a party in an "individual or representative capacity." A key part of this exception is a finding that the statements to be admitted are the party's *own* statements. *See United States v. Traylor*, 656 F.2d 1326, 1332 (9th Cir. 1981). The Court agrees with Crowl that in order for this exception to apply, the statements must be made by a party. While the statements are alleged to have come from Crowl, Ocampo's observation of the statements came from the unknown officer who is not a party to the case. Whether all the statements made by Crowl in a representative capacity is too speculative as there is no way for the Court to ascertain whether the unknown officer recited information in a way representing exactly (or close to exactly) Crowl's words or whether they were her own interpretations/representations of what Crowl had said. The hearsay exception under Rule 801(d)(2)(A) does not apply here.

Under Federal Rule of Evidence 801(d)(2)(D), evidence that may be considered hearsay can be admitted if offered against an opposing party and the statements were made "by the party's agent or employee on a matter within the scope of that relationship . . . ."

Crowl contends there is no information in the record to determine that an agency relationship existed between himself and the unknown officer. However, as noted, there is evidence in the record that there was a female officer (Donna Mader) on Unit 4 at the time

the conversation occurred. Other evidence in the record states that Crowl supervises officers in Unit 4 and together they ensure safety of the prisoners. It is reasonable to assume that the officer who called Crowl was under his supervision and that an agency relationship existed. It is also reasonable that the nature of the phone call was within the scope of that relationship as the officer was reporting information to ensure Ocampo's safety to her superior. Under this exception, statements made by Crowl and relayed by the officer are not hearsay and are admissible. That said, while this exception could make Crowl's statements non-hearsay for the Court, there is a double level of hearsay regarding the relaying of this information from the officer to Ocampo—which as noted above does not fall into a categorical exception.

In sum, the statements Crowl made to the officer are allowed under the agency hearsay exception detailed in Federal Rule of Evidence 801(d)(2)(D). Any statements made from the officer to Ocampo would be inadmissible hearsay without an applicable exception such as notice. Further, any statements Ocampo witnessed the officer say to Crowl are from his personal knowledge and are admissible. Any statements not observed by Ocampo, but relayed between Crowl and the officer are inadmissible hearsay. The Court will allow Ocampo's statements in accordance with the above analysis and has given such statements the weight it deems appropriate. The remaining statements are stricken. The Motion to Strike is accordingly GRANTED in PART and DENIED in PART.

### 3. Conclusion

While the motion to strike has been granted in part, denied in part, and the statements made between Crowl and the officer cannot be admitted for the purpose of

evaluating summary judgment, Ocampo has not met the burden of proof for deliberate indifference and Crowl's motion for summary judgment is GRANTED.

## V. CONCLUSION

The Court has completed an exhaustive review of the record in this case—including all briefing on the current motions and the cases cited at oral argument—and finds that Defendants are entitled to summary judgment.

In hindsight, it is clear that Defendants were wrong in their initial diagnosis of Ocampo's condition.[19] Based on what the Court and the parties collectively know *now*, the Court agrees that Defendants' medical care could have been more effective and efficient. However, that is not the legal standard for an Eighth Amendment deliberate indifference claim. As noted, there is no dispute that Ocampo was suffering from an "objectively serious medical condition." But, the Court must then consider whether any of the defendants *actually* knew of, and disregarded, that risk of harm to Ocampo. *See Gibson,* 290 F.3d at 1187. The Supreme Court has repeatedly explained that there is a difference between "deliberate indifference to serious medical needs of prisoners, and negligence in diagnosing or treating a medical condition," and that "only the former violates the [Eighth Amendment]. *Farmer*, 511 U.S. at 835.

---

[19] However, as noted above, much of the treatment—while incorrect—likely "slowed the progress [of the Ludwig's Angina] and the outcomes may have been worse had they not been used." Dkt. 83-12, at 4-5. To establish deliberate indifference, a plaintiff must show not only a purposeful act or failure to respond to the prisoner's serious medical need, but also specific harm caused by the indifference. *Jett*, 439 F.3d at 1096. In light of the efficacy of Ocampo's treatment in slowing his infection, it is not clear Ocampo could even meet the "harm" element of a deliberate indifference claim. Regardless, his failure to establish the subjective element of his deliberate indifference claim is fatal to his case.

All relevant and admissible evidence before the Court shows that Defendants acted reasonably in this case. There is nothing to indicate that any of the Defendants *knew* that Ocampo was in serious danger and affirmatively disregarded such risks. By all accounts, Defendants were attentive to Ocampo's needs. While some of them may have acted unprofessionally or misdiagnosed Ocampo's condition, none were deliberately indifferent to Ocampo's medical needs.

In a recent case that bears a striking resemblance to the present action, the Seventh Circuit upheld summary judgment granted in favor of a prison doctor who failed to diagnose a prisoner who was suffering from Ludwig's Angina. The Seventh Circuit found that the course of treatment the Doctor undertook—prescribing multiple medications, waiting for the medications to work, observing the patient over a few days, routinely taking his vitals, and then ultimately sending the prisoner to the hospital when his condition worsened—was appropriate and *did not* constitute deliberate indifference. *See Murphy v. Wexford Health Sources Inc.*, 962 F.3d 911, 916 (7th Cir. 2020).

The Court makes a similar finding today. This is a classic *Estelle* medical-disagreement case. Ocampo clearly disagrees with the course of treatment he received, but even if it could be said that this treatment constituted indifference, negligence, or even medical malpractice, it would still not be enough to support a cause of action under the Eighth Amendment. *See Broughton*, 622 F.2d at 460. Ocampo was attended to (almost constantly) by multiple trained medical professionals over the course of multiple days. Again, while those efforts ultimately proved unfruitful, none were undertaken in a manner

so as to limit Ocampo's medical treatment, increase his risks, or inflict cruel and unusual punishment. Summary judgment is, therefore, appropriate.

## VI. ORDER

1. Defendant Dunning's Motion for Summary Judgment (Dkt. 79) is GRANTED.

2. Corizon Defendants' first Motion in Limine (Dkt. 80) is GRANTED in PART and DENIED in PART.

3. Defendant Crowl's Motion for Summary Judgment (Dkt. 82) is GRANTED.

4. Corizon Defendants' Motion for Summary Judgment (Dkt. 83) is GRANTED.

5. Defendant Crowl's Motion to Strike (Dkt. 95) is GRANTED in PART and DENIED in PART.

6. Corizon Defendants' second Motion in Limine (Dkt. 97) is GRANTED in PART and DENIED in PART.

7. Defendant Dunning's Motion to Strike (Dkt. 101) is GRANTED.

8. The Court will enter a separate judgment in accordance with Federal Rule of Civil Procedure 58.

DATED: October 21, 2020

David C. Nye
Chief U.S. District Court Judge